## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| KEN MCDOWELL, individually and on behalf of all others similarly situated, | ) ) ) Case No.: |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| MCDONALD'S CORPORATION, | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Ken McDowell ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant McDonald's Corporation ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this Class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's Big Mac (the "Product"), which is unfit for human consumption because the packaging in which it is contained—and is essential and integral to delivering the Product to the consuming public[1]— contains unsafe per- and polyfluoralkyl substances ("PFAS").[2]

---

[1] Due to the integral and essential nature of the packaging, the term "Product" is used herein to denote both the Product and the Product's packaging.

[2] Discovery may reveal that additional McDonald's products are within the scope of this Complaint. Accordingly, Plaintiff reserves the right to include additional food products identified throughout the course of discovery.

2.     PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[3]

3.     In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[4]

4.     Despite Defendant's representations to consumers that their products are "safe,"[5] and "sustainable,"[6] including in its website and the Product packaging—which is an essential and integral part of delivering the Product to consumers—independent research conducted by Consumer Reports[7] determined that the Product packaging—which is an essential and integral part

---

[3] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.

[4] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last visited Mar. 30, 2022).

[5] *See, e.g.*, McDonald's, "Our Food Philosophy," https://www.mcdonalds.com/us/en-us/about-our-food/our-food-philosophy.html (last visited Mar. 30, 2022) ("At McDonald's . . . [w]e take great care that what we serve every day is safe, great quality, offers choice and is produced in a responsible way.").

[6] *See, e.g.*, McDonald's, "Packaging & Waste," https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/our-planet/packaging-and-waste.html (last visited Mar. 30, 2022) ("Meeting Customer Expectations of Convenience, Safety and Sustainability . . . Together with our Franchisees, suppliers and industry partners, we invest in research and development of new materials and packaging designs that fit our customers' needs for convenience, food safety and sustainability.").

[7] Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited Mar. 30, 2022).

of delivering the Product to consumers—contains **195.3 parts per million (ppm) of total organic fluorine**."[8]

5.     As a point of reference, the current EPA health advisor limit for safe consumption, is just **70 nanograms per liter**.[9] To put this in perspective, **1 part per million is the equivalent of 1,000,000 nanograms per liter**.[10] Accordingly, the Product would expose a consumer to PFAS at levels that are several orders of magnitude higher than one would receive from drinking a liter of water that contains PFAS at the level considered safe by the EPA.

6.     This particularly worrisome in the context of Defendant's packaging for the Product, which emphasizes its sustainable nature in substantially similar to the following manner:





---

[8] According to Toxin Free USA, "organic fluorine results identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources." *See GMO Free v. CoverGirl Cosmetics, et al.*, Case No. 2021-CV-0046786B (D.C. Super. Dec. 20, 2021), Docket No. 1, ¶¶ 30-31.

[9] Duke University, Nicholas School of the Environment, "High Levels of PFAS Found in Anti-Fogging Sprays and Cloths," (Jan. 5, 2022), https://nicholas.duke.edu/news/high-levels-pfas-found-anti-fogging-sprays-and-cloths (last visited Mar. 30, 2022).

[10] JustinTOOLS, "Density Units Conversion parts-per-million to nanograms-per-liter," https://www.justintools.com/unit-conversion/density/php?k1=parts-per-million&k2=nanograms-per-milliliter (last visited Mar. 30, 2022).

7.     The use of the Forest Stewardship Counsel's ("FSC") label serves to assure consumers that the Product packaging is sustainable and can trusted.  As the FSC notes, "[s]een on thousands of product labels around the world, the FSC trademark—most recognizably the famous FSC logo—are trusted by ethical consumers worldwide."[11]  The FSC further notes

8.     In fact, the FSC further notes that the FSC logo may be used to "show[] sustainable credentials to your buyers."[12]  As a user of the FSC logo, Defendant undoubtedly is aware of the importance that consumers attach to it.

9.     Thus, based on Defendant's representations, a reasonable consumer would expect that the Product can be safely purchased and consumed as marketed and sold.  However, the Product is not safe, posing a significant health risk to unsuspecting consumers.  Nor is the Product sustainable.  Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiff that their Product is unsafe and harmful to the environment, contains heightened levels of PFAS, or should otherwise be approached with caution.

10.     Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all other similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, et seq. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, et seq.; (5) Fraud; (6) Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had And Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation;

---

[11] Forest Stewardship Counsel, "How to Use the FSC Logo," https://fsc.org/en/for-businesses/use-our-logo (last visited Mar. 30, 2022).

[12] *Id.*, "Who can use the FSC trademarks?"

(12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; and (14) Negligent Failure to Warn.

## THE PARTIES

11.     Plaintiff Ken McDowell is a natural person and citizen of California who resides in San Rafael, California.  Plaintiff McDowell has purchased the Product from Defendant for several years, including as recently as March 2022 from a McDonald's located in San Rafael, California. Prior to his purchase, Mr. McDowell reviewed the labeling, packaging, and marketing materials of his Product, including those set out herein, including that the Product was safe and sustainable. Mr. McDowell understood that based on Defendant's claims, that Product was safe for consumption, and otherwise a sustainable product.  Mr. McDowell reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. McDowell suffered and continues to suffer, economic injuries.

12.     Mr. McDowell continues to desire to purchase the Product from Defendant. However, Mr. McDowell is unable to determine if the Product is actually safe and sustainable. Mr. McDowell understands that the composition of the Product may change over time.  But as long as Defendant continues to markets its products as "safe" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's Products.  Mr. McDowell is further likely to be repeatedly misled by Defendant's conduct, unless and until

Defendant is compelled to ensure that the Product is marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

13.    Defendant McDonald's Corporation ("Defendant") is a Delaware corporation with its principal place of business located in Chicago, Illinois.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

15.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District, and the acts and transactions giving rise to this action occurred in this District.

16.    This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District and because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Food And Consumer Preferences

17.    According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[13]   Consumers

---

[13] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited Mar. 30, 2021).

ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[14]

18.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[15]

19.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[16]

20.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[17]

21.     Thus, there is enormous incentive for companies such as Defendant to market their products as safe and sustainable.  Indeed, Defendant has repeatedly and pervasively touted these considerations as reasons to purchase the Product over competitors.  Examples of these representations are included below.

22.     These include statements made directly on Defendant's website such as "From the start, we've been committed to doing the right thing.  And every day, all around the globe, we put

---

[14] *Id.*

[15] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-conent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).

[16] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage-processors/ (last visited Mar. 22, 2022).

[17] Made Safe, "What Shoppers Want," at 3.

people, processes and practices into place to make quality food, more responsible sourcing choices, a stronger community and a better planet."[18]

23.     Defendant states on its website that "[f]rom minimizing how much packaging we use to investing and partnering to advance sustainable and regenerative agricultural practices – we want to help protect our planet for communities today and in the future."[19]

24.     Defendant prominently quotes its Executive Vice President, Francesca DeBiase, on its website as stating "'To secure a thriving food system for the future, the food industry has an opportunity—and a responsibility—to help mitigate the impacts of climate change and find more sustainable ways to feed people.'"[20]

25.     Defendant states on its website that its "Packaging helps us serve food quickly and safely to our customers."[21]

26.     Defendant states on its website that "Providing safe food is our number one priority and a responsibility that we take seriously."[22]

27.     Defendant states on its website that "To do this, McDonald's renewed and refreshed our Global Food Safety Strategy in 2019, which ensures we integrate food safety into the design of food [and] packaging[.]"[23]

---

[18] McDonald's, "Values in Action," https://www.mcdonalds.com/us/en-us/about-us/values-in-action.html (last visited Mar. 30, 2022).

[19] McDonald's "Our Planet," https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/our-planet.html (last visited Mar. 30, 2022).

[20] *Id.*

[21] McDonald's, "Climate Risk & Resiliency Summary 2021," https://corporate.mcdonalds.com/content/dam/gwscorp/assets/our-planet/climate-action/McDonalds-2021-Climate-Risk-and-Resiliency-Summary.pdf at 10 (last visited Mar. 30, 2022).

[22] McDonald's, "Food Safety, https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/food-quality-and-sourcing/food-safety.html (last visited Mar. 30, 2022).
[23] *Id.*

28.     Defendant states on its website that "We believe food safety should be a key consideration for every company in our industry[.]"[24]

29.     Defendant has amplified this ethos in its packaging, which, as Defendant notes, "lives seamlessly with the brand identity, as they were created in parallel over the course of four years.  The point-of-view and principles hold true across every menu item to make way for a cohesive system[.]"[25]

30.     Thus, when consumers, like Plaintiff interact with Defendant's packaging, they expect it to embody Defendant's brand, which as noted above, has continuously emphasized safety and sustainability.

31.     And Defendant's recognized this in its report to investors immediately following the rebrand, noting that "From time to time, we have reinvigorated our values to stay responsive to the changing needs of our customers.  In 2020, we did just that – clarifying what guides us and what we stand for to make the values of this Brand as clear, concise and relevant to today as possible."[26]

32.     Defendant noted that this rebrand was reflected in Food Quality and Sourcing, stating that "The safety and quality of our food is a top priority, and we are constantly innovating the strive to meet and exceed our customers' expectations."[27]

---

[24] *Id.*

[25] Packaging Europe, "The inside story of the McDonald's packaging rebrand," (Mar. 11, 2021), https://packagingeurope.com/the-inside-story-of-the-mcdonalds-packaging-rebrand/347.article (last visited Mar. 30, 2022).

[26] McDonald's 2021 Notice of Annual Shareholder's Meeting and Proxy Statement, at 7, https://corporate.mcdonalds.com/content/dam/gwscorp/assets/investors/2021%20Proxy%20Statement.pdf (last visited Mar. 30, 2022).

[27] *Id.* at 10.

33.     However, as described in the next section, Defendant's Product is not safe for consumption, and poses a critical risk to the safety and health of consumers.

**B.     PFAS In Food Packaging Is Harmful To Humans And The Environment**

34.     Consumer Reports' study followed the 2018 groundbreaking research conducted by Toxic Free Future, which first detected PFAS in the Product packaging.[28]

35.     Nonetheless, more than three years later, Consumer Reports revealed that PFAS had not been removed from the Product packaging.  That results of that research is set out below:

## McDonald's

| | | |
|---|---|---|
| Bag for french fries | 🟥🟥 | 250.3 |
| Bag for cookies | 🟥🟥 | 250.0 |
| Bag for Chicken McNuggets | 🟥🟥 | 219.0 |
| Container for Big Mac | 🟥🟥 | 195.3 |
| Wrapper for double cheeseburger | | 15.0 |
| Container for Chicken McNuggets | | 13.5 |
| Container for french fries | | 7.5 |
| Wrapper for Egg McMuffin | | 7.0 |
| Wrapper for McChicken sandwich | | ND |

---

[28] Jen Dickman, *et al.* "Packaged in Pollution: Are food chains using PFAS in packaging?" https://toxicfreefuture.org/packaged-in-pollution/ (last visited Mar. 30, 2022).

36.     The reason companies like Defendant use PFAS in their food packaging products is simple: the coating acts "as a barrier to keep grease from escaping" and "from leaking into people's hands."[29]

37.     But PFAS are not necessary for this intended outcome.  Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no detectable levels of organic fluorine.[30]  Accordingly, Defendant would have had knowledge that they could product the Product packaging without the heightened levels of PFAS inherent in its current composition.

38.     Yet, Defendant chose not to, and instead concealed this information from consumers, to increase by the cost savings associated with using these chemicals.

39.     This has not been without consequences for consumers, as PFAS in food packaging migrates[31] onto the food, exposing consumers to PFAS via ingestion. [32]

40.     Worryingly, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which make them highly persistent both in the environment and in human bodies.

41.     That these substances are harmful to the human body is beyond dispute.  In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology

---

[29]Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last visited Mar. 30, 2022).

[30] *See supra* n. 27 and *supra* n. 6.

[31] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784

[32] *See* Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, https://ntp.niehs.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last visited Mar. 30, 2022).

Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[33]

42. A figure from the European Environmental Agency ("EEA") shows that "effects of PFAS on human health:"[34]



43. The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[35]

---

[33] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last visited Mar. 30, 2022).

[34] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last visited Mar. 30, 2022).

[35] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS," https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Mar. 30, 2022).

44.     In total, this research demonstrates that the risk of severe complications arising from exposure to PFAS is both credible and substantial.

45.     The harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated in the figure below:[36]



46.     Once introduced, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears.[37]  Often making their way to dinner tables of people who did not even purchase the Product.[38]

### C.     Defendant's Misrepresentation and Omissions Are Actionable

47.     Plaintiff and the Class were injured by the full purchase price of the Product because the Product is worthless, as it is marketed as safe and sustainable when it is not in fact safe and sustainable.

---

[36] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed Mar. 30, 2022).

[37] *Id.*

[38] *Id.*

48.     Plaintiff and Class Members bargained for products that are safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them a product in packaging containing dangerous substances with well-known health and environmental consequences.

49.     No reasonable consumer would expect that a product marketed as safe and sustainable would pose a risk to their health, safety, and wellbeing, or that it would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans and the environment.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

50.     As the Product exposes consumers to PFAS that pose a risk to consumers' health, the Product is not fit for consumption by humans.  Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to high levels of toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

51.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Product and to disclose that the Product contained substances known to have adverse health effects.   Nonetheless, Defendant concealed and affirmatively misrepresented the Product, as discussed herein.

52.     Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the PFAS and its failure to disclose the existence of PFAS in the Product to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

53.    **WHO**:  Defendant made material misrepresentations and/or omissions of fact about the Product through its labeling, website representations, and marketing statements, which include the statements that the Product is safe and sustainable.  These representations constitute omitted material information regarding harmful chemicals in the Product packaging which is essential and integral to delivering the Product to the consumer.

54.    **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent because they omitted and concealed that the Product contains substances—PFAS—that are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Product is safe and sustainable, when it is not.  Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner.

55.    **WHEN**:  Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Product, despite its knowledge that the Product packaging contained harmful substances.

56.    **WHERE**:  Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Product's packaging, website, and through marketing materials.

57.    **HOW**:  Defendant made material misrepresentations and/or failed to disclose material facts regarding the Product, including the presence of PFAS.

58.    **WHY**:  Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers

to purchase and/or pay for the Product, the effect of which was that Defendant profited by selling the Product to hundreds of thousands of consumers.

59.     **INJURY**:  Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

60.     Defendant would have had actual knowledge for years that the Product packaging contains harmful chemicals such as PFAS.

61.     Although Defendant was aware of the deception in its labeling given the inclusion of PFAS in the Product despite claims of the Product's safety and sustainability, they took no steps to warn Plaintiff or Class Members of risks related to PFAS in the Product.

62.     Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Product.  Defendant had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product.

63.     Defendant made, and continue to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Product is safe and sustainable.

64.     Defendant concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Product.  Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.  Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

65.     The PFAS included in the formulation, design and/or manufacture of the Product packaging were not reasonably detectible to Plaintiff and Class Members.

66.     At all times, Defendant actively and intentionally concealed the existence of the PFAS and failed to inform Plaintiff or Class Members of the existence of the PFAS.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

67.     Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Product packaging contained harmful chemicals.

68.     Defendant concealed or misrepresented the PFAS for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

69.     As a result of Defendant's active concealment of the PFAS and/or failure to inform Plaintiff and Class Members of the PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Product.

70.     Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Product contained PFAS, which, at the very earliest, would have been in March 2022.  Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS until after the widely publicized Consumer Report's study.  Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of PFAS in the Product and of the Product's true nature.

## **CLASS ALLEGATIONS**

71.     Plaintiff brings this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Product (the "Class").  Excluded from the Class are persons who made such purchases for purposes of resale.

72.     Plaintiff also seeks to represent a subclass of all Class Members who purchased the Product in the State of California (the "California Subclass").  Excluded from the California Subclass are persons who made such purchases for purpose of resale.

73.     As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

74.     At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members").  However, given the nature of the claims and the number Defendant's restaurants in the United States selling Defendant's Product, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

75.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to Class Members predominate over questions that may affect individual Class Members include:

(a)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

(b)     whether Defendant's conduct was unfair and/or deceptive;

(c) whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

(d) whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

76. With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act as well as the California Unfair Competition Law.

77. Plaintiff's claims are typical of those of the Class because Plaintiff, like all Class Members, purchased, in a typical consumer setting, Defendant's Product, and Plaintiff sustained damages from Defendant's wrongful conduct.

78. Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

79. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

**COUNT I**
**(Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**

80.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

81.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

82.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

83.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

84.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Berverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

85.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers. In addition,

Defendant have committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

86.     Plaintiff and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

87.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

88.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

89.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

90.     Plaintiff and the other California Subclass Members suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

91.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

92.     Plaintiff and the other California Subclass Members had no way of reasonably knowing that the Product they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

93.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other California Subclass Members.

94.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

### COUNT II
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code § 1750, *et seq.*)**
**(Injunctive Relief Only)**

95.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

96.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

97.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

98.     Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

99.     Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

100.    Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as safe and sustainable, when in fact the Product is not safe, dangerous, and useless.

101.    The Product is not safe because they contain an extraordinary level of PFAS in the packaging which is essential and integral to the delivery of the Product to consumers that subject unsuspecting consumers to significant health risks.

102.    Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiff or California Subclass Members.

103.    Defendant made partial representations to Plaintiff and California Subclass Members, while suppressing the true nature of the Product. Specifically, by displaying the Product and describing the Product as safe and sustainable, including on the product packaging, on its website, and in its marketing, without disclosing that the Product was unsafe and detrimental to human health and the environment. As described above, Defendant was in receipt of knowledge pertaining to PFAS in their Product and yet for a period of several years has continued to Product. Moreover, Defendant affirmatively misrepresented the Product despite its knowledge that the Product was not as advertised.

104.    Plaintiff and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

105.    On March 30, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that tit was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Because of the gravity of the harm alleged, Plaintiff has chosen not to wait for Defendant's response.  Plaintiff has also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein.  Accordingly, Plaintiff's letter would not have served the purpose of the letter.

106.    Accordingly, Plaintiff and the California Subclass Members seek injunctive relief available under the CLRA.  Should Defendant choose not to remedy the situation within 30 days of the letter, Plaintiff reserves the right to amend his complaint for damages and reasonable attorney's fees.

### COUNT III
**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

107.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

108.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

109.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the

manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

110. The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

111. Plaintiff and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

112. Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Product to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

113. Defendant impliedly warranted to retailer buyers that the Product was merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Product is used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Product was unsafe for consumption. Therefore, the Product would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

114. Plaintiff and California Subclass Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

115. The Product was not altered by Plaintiff or the California Subclass Members.

116. The Product was defective at the time of sale when they it the exclusive control of Defendant. The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

117. Defendant knew that the Product would be purchased and used without additional testing by Plaintiff and Class Members.

118. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that they were unfit for use and posed a significant safety risk.

119. Plaintiff and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

### COUNT IV
**(Violation of California's False Advertising Law,
Cal. Bus. & Prof. Code § 17500, *et seq*.)**

120. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

121. Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

122. Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public. As described above, and throughout this Complaint, Defendant misrepresented the Product as safe and sustainable when, in fact, the Product was not safe and not sustainable.

123. By its actions, Defendant disseminated uniform advertising regarding the Product to and across California. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*. Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

124. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the

Product contains substances that pose a significant risk to the health and wellbeing of Plaintiff and the Subclass Members as well as to the environment.

125.    Defendant continues to misrepresent to consumers that the Product was safe and sustainable. However, as described, this is not the case.

126.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiff and other Class Members based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to tens of millions of dollars. Plaintiff and Class Members were injured in fact and lost money and property as a result.

127.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

128.    As a result of Defendant's wrongful conduct, Plaintiff and Class Members lost money in an amount to be proven at trial. Plaintiff and Class Members are therefore entitled to restitution as appropriate for this cause of action.

129.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT V
### (Fraud)

130.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

131.    Plaintiff brings this claim individually and on behalf of the Class.

132.     At the time Plaintiff and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as safe and sustainable.

133.     Defendant affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for use.

134.     Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

135.     Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

136.     Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

137.     Plaintiff and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Product.

138.     Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VI
### (Constructive Fraud)

139.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

140.     Plaintiff brings this claim individually and on behalf of the Class.

141.     At the time Plaintiff and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

142. Defendant affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for consumption and otherwise sustainable.

143. Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

144. Defendant had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiff and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

145. Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

146. Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

147. Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Product, and what information was available regarding the Product.

148. Defendant breached its duty to Plaintiff and Class Members to make full disclosures of the safety of their Product.

149.     Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Inducement)

150.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

151.     Plaintiff brings this claim individually and on behalf of the Class.

152.     Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

153.     Defendant knew, or should have known, that the Product was falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

154.     Defendant also knew that its omissions and misrepresentations regarding the Product was material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

155.     Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

156.     Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

157.     Plaintiff and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Product, and what information was available regarding the Product.

158. Defendant intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the Product based upon its affirmative representations and omissions.

159. Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VIII
### (Money Had and Received)

160. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

161. Plaintiff brings this claim individually and on behalf of the Class.

162. As a result of the Plaintiff's and Class Members' purchase of the Product, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and Class Members in an amount to be determined at trial.

163. No part of any of the monies due and owing to Plaintiff and Class Members has been repaid, although Plaintiff and Class Members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT IX
### (Fraudulent Concealment or Omission)

164. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

165. Plaintiff brings this claim individually and on behalf of the Class.

166. At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Product.

167. Defendant, acting through its representatives or agents, delivered the Product to its own distributors and various other distribution channels.

168.     Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Product as discussed throughout.

169.     Rather than inform consumers of the truth regarding the Product, Defendant misrepresented the quality of the Product as discussed herein at the time of purchase.

170.     Defendant made these material misrepresentations to boost or maintain sales of the Product, and to falsely assure purchasers of the Product that Defendant is a reputable company and that its Product is safe for use and is otherwise sustainable.  The false representations were material to consumers because the representations played a significant role in the value of the Product purchased.

171.     Plaintiff and Class Members accepted the terms of use, which were silent on the true nature of the Product, as discussed throughout.  Plaintiff and Class Members had no way of knowing that Defendant's misrepresentations as to the Product, and had no way of knowing that Defendant's misrepresentations were misleading.

172.     Although Defendant had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

173.     Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Product were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Product.  Such benefits came at the expense of Plaintiff and Class Members.

174.     Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and class members' actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control of material facts, and such facts were not known to the public.

175.    Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Product that did not live up to its advertised representations. Plaintiff and Class Members are entitled to recover full refunds for the Product they purchased due to Defendant's misrepresentations.

176.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT X
### (Fraudulent Misrepresentation)

177.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

178.    Plaintiff brings this claim individually and on behalf of the Class.

179.    Defendant falsely represented to Plaintiff and the Class that the Product was safe for use and otherwise sustainable.

180.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Product.

181.    Defendant knew or should have known that its representations about the Product were false in that the Product is not safe for consumption as discussed throughout. Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

182.    Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment. Given the deceptive manner in which Defendant advertised,

marketed, represented, and otherwise promoted the Product, Plaintiff's and the Class' reliance on Defendant's misrepresentations was justifiable.

183.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known of the safety risks associated with the Product and that it does not conform to the Product's labels, packaging, advertising, and statements.

184.    Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT XI
### (Negligent Misrepresentation)

185.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

186.    Plaintiff brings this claim individually and on behalf of the Class.

187.    Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Product.

188.    Defendant breached its duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Product from the marketplace or take other appropriate remedial action.

189.    Defendant knew or should have known that the qualities and characteristics of the Product were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Product was not safe for use and not sustainable.

190.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known that the Product was not safe for consumption and that the Product does not conform to the Product's labeling, packaging, advertising, and statements.

191.     Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

**COUNT XII**
**(Quasi-Contract / Unjust Enrichment)**

192.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

193.     Plaintiff brings this claim individually and on behalf of the Class.

194.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

195.     Plaintiff and Class Members conferred benefits on Defendant by purchasing the Product.

196.     Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Product.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product was unfit for its intended purpose as it was unsafe for use.  These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Product if the true facts were known.

197.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT XIII
### (Breach of Express Warranty)

198.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

199.    Plaintiff brings this claim individually and on behalf of the Class.

200.    Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased the Product.

201.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

202.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

203.    As set forth above, Defendant purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and is otherwise sustainable.

204.    Plaintiff and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

205.    Defendant breached express warranties about the Product and its qualities because despite Defendant's warranties that the Product is safe for consumption and is otherwise sustainable the Product is objectively not in fact safe for use and not sustainable.  Thus, the Product did not confirm to Defendant's affirmations and promises described above.

206.    Plaintiff and each Class Member would not have purchased the Product had they known the true nature of the Product.

207.    As a result of Defendant's breach of warranty, Plaintiff and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

## COUNT XIV
### (Negligent Failure to Warn)

208.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

209.    Plaintiff brings this claim individually and on behalf of the Class.

210.    At all relevant times, Defendant were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product and its packaging.  At all relevant times, it was reasonably foreseeable by Defendant that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

211.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

212.    Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of the Product.

213.    At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

214.    Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Product, including Plaintiff and the Class, regarding the true nature of the Product, its risks, and potential dangers.

215.    Defendant was negligent and breached its duty of care by concealing the risks of

and failing to warn consumers that the Product contains ingredients known to cause adverse health

effects in humans.

216.    Defendant knew, or through the exercise of reasonable care, should have known of

the inherent Defect and resulting dangers associated with using the Product as described herein,

and knew that Plaintiff and Class Members could not reasonably be aware of those risks.

Defendant failed to exercise reasonable care in providing Plaintiff and the Class with adequate

warnings.

217.    As a direct and proximate result of Defendant's failure to adequately warn

consumers that the use of the Product, including its intended use, could cause and has caused

injuries and other damages, Plaintiff and the Class have suffered damages, as described herein.

Plaintiff also requests medical monitoring as a means to safeguard their health and mitigate any

damages for future medical treatment.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendant, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23 and naming
Plaintiff as representative of the Class and the California Subclass and
Plaintiff's attorneys as Class Counsel;

(b)    For an order declaring the Defendant's conduct violates the statutes
referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class, and the California
Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be
determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper;

(h)     For medical monitoring as a means to safeguard Plaintiff's and Class Members health and to mitigate any damages for future medical treatment; and

(i)     For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 31, 2022

Respectfully submitted,

By:   _/s/ Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
Carl V. Malmstrom
111 W. Jackson St., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Fax: (212) 686-0114
Email:  malmstrom@whafh.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*Pro Hac Vice* Forthcoming)
Sean L. Litteral (*Pro Hac Vice* Forthcoming)
Julia K. Venditti (*Pro Hac Vice* Forthcoming)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com
            slitteral@bursor.com
            jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice* Forthcoming)
Alec M. Leslie (*Pro Hac Vice* Forthcoming)

888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com
     aleslie@bursor.com

*Attorneys for Plaintiffs and the Putative Class*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Carl V. Malmstrom, declare as follows:

1.  I am an attorney at law licensed to practice in the State of Illinois and a member of the bar of this Court.  I am Of Counsel at Wolf Haldenstein Adler Freeman & Herz LLC, counsel of record for Plaintiff Ken McDowell.  Plaintiff McDowell resides in San Rafael, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.  The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of Illinois.  Additionally, Defendant maintains its principal place of business in this District and Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiffs from this District.

I declare under the penalty of perjury under the laws of the State of Illinois and the United States that the foregoing is true and correct and that this declaration was executed at Chicago, Illinois, this 31st day of March, 2022.


    /s/ Carl V. Malmstrom
          Carl V. Malmstrom