**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| KEN MCDOWELL and JOSEPH COLLORA, individually and on behalf of all others similarly situated, | ) ) ) ) | Case No.: 1:22-cv-01688 Judge: Franklin U. Valderrama Magistrate Judge: Young B. Kim |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MCDONALD'S CORPORATION, | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) | |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Ken McDowell and Joseph Collora ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant McDonald's Corporation ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this Class action lawsuit on behalf of themselves and similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's Big Mac or French Fries ("Products"), which are unfit for human consumption because the packaging in which they are contained—and is essential and integral to delivering the

Products to the consuming public[1]—contain heightened levels of organic fluorine and unsafe per- and polyfluoralkyl substances ("PFAS").[2]

2.     PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[3]

3.     In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[4]

4.     Despite Defendant's representations to consumers that its products are "safe,"[5] and "sustainable,"[6] including in its website and the Products' packaging—which is an essential and integral part of delivering the Product to consumers—independent research conducted by Dr. Lara

---

[1] Due to the integral and essential nature of the packaging, the term "Products" or "Product" is used herein to denote both the Products and the Products' packaging.

[2] Discovery may reveal that additional McDonald's products are within the scope of this Complaint. Accordingly, Plaintiffs reserve the right to include additional food products identified throughout the course of discovery.

[3] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.

[4] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last visited July 1, 2022).

[5] *See, e.g.*, McDonald's, "Our Food Philosophy," https://www.mcdonalds.com/us/en-us/about-our-food/our-food-philosophy.html (last visited July 1, 2022) ("At McDonald's . . . [w]e take great care that what we serve every day is safe, great quality, offers choice and is produced in a responsible way.").

[6] *See, e.g.*, McDonald's, "Packaging & Waste," https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/our-planet/packaging-and-waste.html (last visited July 1, 2022) ("Meeting Customer Expectations of Convenience, Safety and Sustainability . . . Together with our Franchisees, suppliers and industry partners, we invest in research and development of new materials and packaging designs that fit our customers' needs for convenience, food safety and sustainability.").

Schultes of Stockholm University and Dr. Graham Peaslee of the University of Notre Dame and published in *Environmental Science & Technology Letters* in February 2019, determined that the packaging for Defendant's French Fries contain harmful PFAS.

5.     Subsequent testing performed more than two year later by Consumer Reports[7] determined that the packaging for both products—which is an essential and integral part of delivering the Product to consumers—contain measurable amounts of organic fluorine, which is indicative of the existence of PFAS.  Specifically, Consumer Reports determined that the Product packaging for the Big Mac contained 195.3 parts per million (ppm) of total organic fluorine and the Product packaging for French Fries contained 250.3 ppm of organic fluorine.[8]

6.      Additional testing commissioned by Plaintiffs and conducted by Galbraith Laboratories also showed the existence of organic fluorine in the Product packaging for the Big Mac.

7.     Defendant relies on many of the same suppliers for each of the Products' packaging and has not substantially or meaningfully altered its suppliers for the Products' packaging for several years.  In addition, Defendant has not substantially or meaningfully altered the components comprising the Products' packaging within the past several years.

8.     Because the packaging for the Products is comprised of similar and unaltered components, both have tested positive for organic fluorine, which is itself indicative of PFAS, and the packaging for the French Fries has tested positive for certain named and harmful PFAS, it is highly likely that packaging for the Big Mac is also comprised of certain named PFAS.

---

[7]  Kevin Loria, "Dangerous PFAS Chemicals Are in Your Food Packaging," *Consumer Reports*, https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ (last visited July 1, 2022).

[8] Organic fluorine results identify a quantity of organofluorine compounds (e.g., PFAS) and excludes the possibility that fluorine may be present from other or natural sources.

9.     The heightened amounts indicated by all studies detailed above is concerning, particularly when viewed in reference to threshold amounts indicated in various regulations.  For example, California has passed regulations effective in 2023 that bans food packaging containing over 100 ppm organic fluorine, and Denmark already prohibits food packaging containing over 20 ppm organic fluorine.

10.     Defendant nonetheless emphasizes the sustainable nature of its Products' packaging in a substantially similar manner, as exemplified below:



11.     The use of the Forest Stewardship Counsel's ("FSC") label serves to assure consumers that the Products packaging is sustainable and can trusted.  As the FSC notes, "[s]een on thousands of product labels around the world, the FSC trademark—most recognizably the famous FSC logo—are trusted by ethical consumers worldwide."[9]

---

[9] Forest Stewardship Counsel, "How to Use the FSC Logo," https://fsc.org/en/for-businesses/use-our-logo (last visited July 1, 2022).

12.     In fact, the FSC further notes that the FSC logo may be used to "show[] sustainable credentials to your buyers."[10]  As a user of the FSC logo, Defendant undoubtedly is aware of the importance that consumers attach to it.

13.     Thus, based on Defendant's representations, a reasonable consumer would expect that the Products can be safely purchased and consumed as marketed and sold.  However, the Products are not safe, posing a significant health risk to unsuspecting consumers.  Nor are the Products sustainable.  Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiffs that its Products are unsafe and harmful to the environment, contain heightened levels of organic fluorine and certain named PFAS, or should otherwise be approached with caution.

14.     Accordingly, Plaintiffs bring their claims against Defendant individually and on behalf of a class of all other similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (2) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.; (3) breach of the Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, et seq. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, et seq.; (5) violation of the New York General Business Law § 349; (6) violation of the New York General Business Law § 350; (7) Fraud; (8) Constructive Fraud; (9) Fraudulent Inducement; (10) Money Had And Received; (11) Fraudulent Omission or Concealment; (12) Fraudulent Misrepresentation; (13) Negligent Misrepresentation; (14) Quasi-Contract / Unjust Enrichment; (15) Breach of Express Warranty; and (16) Negligent Failure to Warn.

**THE PARTIES**

---

[10] *Id.*, "Who can use the FSC trademarks?"

15.     Plaintiff Ken McDowell is a natural person and citizen of California who resides in San Rafael, California.  Plaintiff McDowell has purchased the Products from Defendant for several years, including as recently as March 2022 from a McDonald's located in San Rafael, California. Prior to his purchase, Mr. McDowell reviewed the labeling, packaging, and marketing materials of his Products, including those set out herein, including that the Products were safe and sustainable.  Mr. McDowell understood that based on Defendant's claims, that the Products were safe for consumption, and otherwise sustainable products.  Mr. McDowell reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. McDowell suffered and continues to suffer, economic injuries.

16.     Mr. McDowell continues to desire to purchase the Products from Defendant. However, Mr. McDowell is unable to determine if the Products are actually safe and sustainable. Mr. McDowell understands that the composition of the Products may change over time.  But as long as Defendant continues to markets its products as "safe" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products.  Mr. McDowell is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

17.     Plaintiff Joseph Collora is a natural person and citizen of New York who resides in Lindenhurst, New York.  Plaintiff Collora has purchased the Products from Defendant for several

years, often visiting the McDonald's restaurant in Lindenhurst, including as recently as January and March 2022.  Prior to his purchase, Mr. Collora reviewed the labeling, packaging, and marketing materials of the Products, including those set out herein, including that the Products were safe and sustainable.  Mr. Collora understood that based on Defendant's claims, that Products were safe for consumption, and otherwise sustainable products.  Mr. Collora reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. Collora suffered and continues to suffer, economic injuries.

18.    Mr. Collora continues to desire to purchase the Products from Defendant. However, Mr. Collora is unable to determine if the Products are actually safe and sustainable.  Mr. Collora understands that the composition of the Products may change over time.  But as long as Defendant continues to markets its products as "safe" and "sustainable," he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products.  Mr. Collora is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products are marketed, labeled, packaged, and advertised as safe and sustainable, are in fact safe and sustainable.

19.    Defendant McDonald's Corporation ("Defendant") is a Delaware corporation with its principal place of business located in Chicago, Illinois.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and at least one Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

21.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District, and the acts and transactions giving rise to this action occurred in this District.

22.     This Court is the proper venue for this action pursuant to pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District and because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

## **FACTUAL ALLEGATIONS**

### **A.     Food and Consumer Preferences**

23.     According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[11]   Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[12]

---

[11] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-top-food-safety-concern-among-consumers/ (last visited July 1, 2022).

[12] *Id.*

24.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[13]

25.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[14]

26.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[15]

27.     Thus, there is enormous incentive for companies such as Defendant to market their products as safe and sustainable.  Indeed, Defendant has repeatedly and pervasively touted these considerations as reasons to purchase the Products over competitors' Products.  Examples of these representations are included below.

28.     These include statements made directly on Defendant's website such as "From the start, we've been committed to doing the right thing.  And every day, all around the globe, we put

---

[13]   Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-content/uploads/2017/07/What-Shoppers-Want.pdf (last visited July 1, 2022).

[14]   Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-the-game-for-food-beverage-processors/ (last visited July 1, 2022).

[15]   Made Safe, "What Shoppers Want," at 3.

people, processes and practices into place to make quality food, more responsible sourcing choices, a stronger community and a better planet."[16]

29.     Defendant states on its website that "[f]rom minimizing how much packaging we use to investing and partnering to advance sustainable and regenerative agricultural practices – we want to help protect our planet for communities today and in the future."[17]

30.     Defendant prominently quotes its Executive Vice President, Francesca DeBiase, on its website as stating "'To secure a thriving food system for the future, the food industry has an opportunity—and a responsibility—to help mitigate the impacts of climate change and find more sustainable ways to feed people.'"[18]

31.     Defendant states on its website that its "Packaging helps us serve food quickly and safely to our customers."[19]

32.     Defendant states on its website that "Providing safe food is our number one priority and a responsibility that we take seriously."[20]

33.     Defendant states on its website that "To do this, McDonald's renewed and refreshed our Global Food Safety Strategy in 2019, which ensures we integrate food safety into the design of food [and] packaging[.]"[21]

---

[16] McDonald's, "Values in Action," https://www.mcdonalds.com/us/en-us/about-us/values-in-action.html (last visited July 1, 2022).

[17] McDonald's "Our Planet," https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/our-planet.html (last visited July 1, 2022).

[18] *Id.*

[19]      McDonald's,     "Climate     Risk     &     Resiliency     Summary     2021," https://corporate.mcdonalds.com/content/dam/gwscorp/assets/our-planet/climate-action/McDonalds-2021-Climate-Risk-and-Resiliency-Summary.pdf at 10 (last visited July 1, 2022).

[20] McDonald's, "Food Safety, https://corporate.mcdonalds.com/corpmcd/our-purpose-and-impact/food-quality-and-sourcing/food-safety.html (last visited July 1, 2022).
[21] *Id.*

34.     Defendant states on its website that "We believe food safety should be a key consideration for every company in our industry[.]"[22]

35.     Defendant has amplified this ethos in its packaging, which, as Defendant notes, "lives seamlessly with the brand identity, as they were created in parallel over the course of four years.  The point-of-view and principles hold true across every menu item to make way for a cohesive system[.]"[23]

36.     Thus, when consumers, like Plaintiffs interact with Defendant's packaging, they expect it to embody Defendant's brand, which as noted above, has continuously emphasized safety and sustainability.

37.     And Defendant recognized this in its report to investors immediately following the rebrand, noting that "From time to time, we have reinvigorated our values to stay responsive to the changing needs of our customers.  In 2020, we did just that – clarifying what guides us and what we stand for to make the values of this Brand as clear, concise and relevant to today as possible."[24]

38.     Defendant noted that this rebrand was reflected in Food Quality and Sourcing, stating that "The safety and quality of our food is a top priority, and we are constantly innovating the strive to meet and exceed our customers' expectations."[25]

39.     Consumers would not expect that Defendant's Products, which are marketed as safe and sustainable, would contain heightened levels of organic fluorine and cancer-causing PFAS.

---

[22] *Id.*

[23] Packaging Europe, "The inside story of the McDonald's packaging rebrand," (Mar. 11, 2021), https://packagingeurope.com/the-inside-story-of-the-mcdonalds-packaging-rebrand/347.article (last visited July 1, 2022).

[24] McDonald's 2021 Notice of Annual Shareholder's Meeting and Proxy Statement, at 7, https://corporate.mcdonalds.com/content/dam/gwscorp/assets/investors/2021%20Proxy%20Statement.pdf (last visited July 1, 2022).

[25] *Id.* at 10.

40.     As described below, despite Defendant's targeted rebranding efforts, Defendant's Products are not sustainable or safe for consumption, and pose a critical risk to the safety and health of consumers.

**B.     PFAS In Food Packaging Is Harmful To Humans And The Environment**

41.     Dr. Schultes' and Dr. Peaslee's research published in Environmental Science & Technology Letters in February 2019 revealed that the packaging for Defendant's French Fries contain harmful PFAS, including perfluorohexanoic acid ("PFHxA"), perfluoroheptanoic acid ("PFHpA"), perfluorooctanoic acid ("l-PFOA"), perfluorooctane sulfonate ("1-PFOS"), perfluorodecanoic acid ("PFDA"), perfluoroundecanoic acid ("PFUnDA"), perfluorotridecanoic acid ("PFTrDA"), perfluorotetradecanoic acid ("PFTeDA"), 6:2 fluorotelomer phosphate diester ("6:2 diPAP"), 8:2 fluorotelomer phosphate diester ("8:2 diPAP"), 6:2:8:2 fluorotelomer phosphate diester ("6:2/8:2 diPAP"), 8:2/12:2 fluorotelomer phosphate diester ("8:2/12:2 diPAP"), and 6:2/10:2 fluorotelomer phosphate diester ("6:2/10:2 diPAP"), among several others.

42.     The health risks from these PFAS are serious. For example, the Environmental Protection Agency ("EPA") has indicated that PFHxA can cause hepatic, developmental, and hematopoietic effects in humans.

43.     Several of the others are known to cause thyroid disruption, induce apoptosis, or the death of cells, hepatoxicity, neurotoxicity, reproductive toxicity, immunotoxicity, renal toxicity, oxidative stress, osteoarthritis, decreased antibody response to vaccines, amongst a multitude of other harmful effects.

44.     The researchers' study built on the 2018 published findings by Toxic Free Future which demonstrated that the Products contained heightened levels of organic fluorine.[26]

---

[26] Jen Dickman, *et al.* "Packaged in Pollution: Are food chains using PFAS in packaging?" https://toxicfreefuture.org/packaged-in-pollution/ (last visited July 1, 2022).

45.     These results were replicated and expanded upon by Consumer Reports in March 2022. The results of that testing are set out below:

| McDonald's | | |
|---|---|---|
| Bag for french fries | 🟥🟥 | 250.3 |
| Bag for cookies | 🟥🟥 | 250.0 |
| Bag for Chicken McNuggets | 🟥🟥 | 219.0 |
| Container for Big Mac | 🟥🟥 | 195.3 |
| Wrapper for double cheeseburger | | 15.0 |
| Container for Chicken McNuggets | | 13.5 |
| Container for french fries | | 7.5 |
| Wrapper for Egg McMuffin | | 7.0 |
| Wrapper for McChicken sandwich | | ND |

46.     As demonstrated, despite containing less organic fluorine than the wrapper for French Fries, the Big Mac container contains a material amount of PFAS.

47.     Additionally, Plaintiffs conducted further testing at Galbraith Laboratory in May 2022 and, again, found heightened levels of organic fluorine.

48.     The reason companies like Defendant use PFAS in their food packaging products is simple: the coating acts "as a barrier to keep grease from escaping" and "from leaking into people's hands."[27]

---

[27]Iowa State University, "New study calls for mitigation, monitoring of common grease-proofing food packaging chemicals," *News Service* (Oct. 19, 2021), https://www.news.iastate.edu/news/2021/10/19/pfas2021 (last visited July 1, 2022).

49. But PFAS are not necessary for this intended outcome. Indeed, numerous of Defendant's competitors' products have been tested by researchers and found to contain no detectable levels of organic fluorine.[28] Accordingly, Defendant would have had knowledge that it could produce the Products' packaging without the heightened levels of PFAS inherent in its current composition.

50. Yet, Defendant chose not to, and instead concealed this information from consumers, to increase by the cost savings associated with using these chemicals.

51. This has not been without consequences for consumers, as PFAS in food packaging migrates[29] onto the food, exposing consumers to PFAS via ingestion.[30]

52. Worryingly, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which make them highly persistent both in the environment and in human bodies.

53. That these substances are harmful to the human body is beyond dispute. In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[31]

54. A figure from the European Environmental Agency ("EEA") shows that "effects of PFAS on human health:"[32]

---

[28] *See supra* n. 27 and *supra* n. 7.

[29] T.H. Begley, "Migration of fluorochemical paper additives from food-contact paper into foods and food simulants," Food Additives & Contaminants: Part A, 25:3, 284-390, https://www.tandfonline.com/doi/abs/10.1080/02652030701513784

[30] *See* Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index/html (Aug. 3, 2021) (last visited July 1, 2022).

[31] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last visited July 1, 2022).

[32] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last visited July 1, 2022).



55.     The Centers for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[33]

56.     In total, this research demonstrates that the risk of severe complications arising from exposure to PFAS is both credible and substantial.

57.     The harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated in the figure below:[34]

---

[33] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS," https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed July 1, 2022).
[34] PFAS Free, "What are PFAS?" https://www.pfasfree.org.uk/about-pfas (last accessed July 1, 2022).



58.     Once introduced, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears.[35]  Often making their way to dinner tables of people who did not even purchase the Product.[36]

### C.     Defendant's Misrepresentations and Omissions Are Actionable

59.     Plaintiffs and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as safe and sustainable when they are not in fact safe and sustainable.

60.     Plaintiffs and Class Members bargained for products that are safe for consumption and sustainable, and were deprived of the basis of their bargain when Defendant sold them Products in packaging containing dangerous substances with well-known health and environmental consequences.

---

[35] *Id.*

[36] *Id.*

61.     No reasonable consumer would expect that Products marketed as safe and sustainable would pose a risk to their health, safety, and wellbeing, or that they would contain heightened levels of organic fluorine and dangerous PFAS, which are indisputably linked to harmful health effects in humans and the environment. Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Products.

62.      As the Products exposes consumers to organic fluorine and PFAS that pose a risk to consumers' health, the Products are not fit for consumption by humans. Plaintiffs and the Class are further entitled to damages for the injury sustained in being exposed to heightened levels of organic fluorine and toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

63.     Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects. Nonetheless, Defendant concealed and affirmatively misrepresented the Products, as discussed herein.

64.     Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the PFAS and its failure to disclose the existence of organic fluorine and PFAS in the Products to consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

65.     **WHO**:    Defendant, McDonald's, made material misrepresentations and/or omissions of fact about the Products through its labeling, website representations, and marketing statements, which include the statements that the Products are safe and sustainable. These

representations constitute omitted material information regarding harmful chemicals in the Products' packaging which is essential and integral to delivering the Products to the consumer.

66.     **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain substances—organic fluorine and PFAS—that are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products are safe and sustainable, when they are not.  Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products in this manner.

67.     **WHEN**:  Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiffs and Class Members purchased the Products, despite its knowledge that the Products' packaging contained harmful substances.

68.     **WHERE**:  Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Products' packaging, website, and through marketing materials.

69.     **HOW**:  Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of heightened levels of organic fluorine and PFAS.

70.     **WHY**:  Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

71.     **INJURY**:  Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

72.     Defendant would have had actual knowledge for years that the Products' packaging contains harmful chemicals such as heightened level of organic fluorine and PFAS.

73.     Although Defendant was aware of the deception in its labeling given the inclusion of organic fluorine and PFAS in the Products despite claims of the Products' safety and sustainability, it took no steps to warn Plaintiffs or Class Members of risks related to organic fluorine and PFAS in the Products.

74.     Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products.  Defendant had a duty to disclose the true nature and quality of the Products and to disclose the health and safety risks associated with the Products.

75.     Defendant made, and continues to make, affirmative misrepresentations to consumers, to promote sales of the Products, including that the Products are safe and sustainable.

76.     Defendant concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products.  Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members.  Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

77.    The organic fluorine and PFAS included in the formulation, design and/or manufacture of the Products' packaging were not reasonably detectible to Plaintiffs and Class Members.

78.    At all times, Defendant actively and intentionally concealed the existence of the organic fluorine and PFAS and failed to inform Plaintiffs or Class Members of the existence of the organic fluorine and PFAS.  Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

79.    Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Products' packaging contained harmful chemicals.

80.    Defendant concealed or misrepresented the organic fluorine and PFAS for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

81.    As a result of Defendant's active concealment of the organic fluorine and PFAS and/or failure to inform Plaintiffs and Class Members of the organic fluorine and PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Products.

82.    Further, the causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that the Products contained PFAS, which, at the very earliest, would have been in March 2022.  Plaintiffs and Class Members had no realistic ability to discern that the Products contained organic fluorine and PFAS until after the Consumer Report's study.  Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of organic fluorine and PFAS in the Products and of the Products' true nature.

20

## CLASS ALLEGATIONS

83. Plaintiffs bring this class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Products (the "Class"). Excluded from the Class are persons who made such purchases for purposes of resale.

84. Plaintiffs also seek to represent a subclass of all Class Members who purchased the Products in the State of California (the "California Subclass") and in the State of New York (the "New York Subclass"). Excluded from the California Subclass and New York Subclass are persons who made such purchases for purpose of resale.

85. As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

86. At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members"). However, given the nature of the claims and the number Defendant's restaurants in the United States selling Defendant's Products, Plaintiffs believe that Class and Subclass Members are so numerous that joinder of all members is impracticable.

87. There is a well-defined community of interest in the questions of law and facts involved in this case. Questions of law and facts common to Class Members predominate over questions that may affect individual Class Members include:

(a) whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b) whether Defendant's conduct was unfair and/or deceptive;

(c)     whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

(d)     whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

88.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act and the California Unfair Competition Law.

89.     With respect to the New York Subclass, additional questions of law and fact common to the members include whether Defendant violated New York General Business Law §§ 349 & 350.

90.     Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all Class Members, purchased, in a typical consumer setting, Defendant's Products, and Plaintiffs sustained damages from Defendant's wrongful conduct.

91.     Plaintiffs are adequate representatives of the Class and Subclass because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

92.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases

the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
### (Violation of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

93.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

94.     Plaintiff McDowell brings this claim individually and on behalf of the California Subclass against Defendant.

95.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

96.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

97.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of

California's False Advertising Law, in addition to breaches of warranty and violations of common law.

98.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products are likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

99.     Plaintiff McDowell  and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

100.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.     Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

101.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein as discussed above.

102.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

103.     Plaintiff McDowell   and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent

24

Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

104.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

105.     Plaintiff McDowell  and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

106.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff McDowell and the other California Subclass Members.

107.     Pursuant to California Business and Professional Code § 17203, Plaintiff McDowell  and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' and the California Subclass' attorneys' fees and costs.

108.     Here, equitable relief is appropriate because Plaintiff McDowell may lack an adequate remedy at law, if, for instance damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff McDowell would be left without the parity in purchasing power to which they are entitled.

109. Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff McDowell and Class members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

110. Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the organic fluorine and PFAS in the Products' packaging; or (2) the removal of such chemicals from the Products' packaging, will ensure that Plaintiff McDowell is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

**COUNT II**
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code § 1750, *et seq.*)**

111. Plaintiffs reallege and reincorporates by reference all paragraphs alleged above.

112. Plaintiff McDowell brings this claim individually and on behalf of the California Subclass against Defendant.

113. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

114. Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

26

115. Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

116. Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Products as safe and sustainable, when in fact the Products are not safe, dangerous, and useless.

117. The Products are not safe because they contain a heightened level of organic fluorine and PFAS in the packaging which is essential and integral to the delivery of the Products to consumers that subject unsuspecting consumers to significant health risks.

118. Defendant has exclusive and/or superior knowledge of the Products' composition, which was not known to Plaintiff McDowell or California Subclass Members.

119. Defendant made partial representations to Plaintiff McDowell and California Subclass Members, while suppressing the true nature of the Products. Specifically, by displaying the Products and describing the Products as safe and sustainable, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were unsafe and detrimental to human health and the environment. As described above, Defendant was in receipt of knowledge pertaining to organic fluorine and PFAS in its Products and yet for a period of several years has continued to sell the Products. Moreover, Defendant affirmatively misrepresented the Products despite its knowledge that the Product was not as advertised.

120. Plaintiff McDowell and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

121. On March 30, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code §

1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of all other similarly situated purchasers. Defendant refused to correct its practices. Accordingly, Plaintiff, individually, and on behalf of the proposed Class, seeks, in addition to injunctive relief, monetary damages and attorneys' fees from Defendant as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

122. Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

123. Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

124. Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the organic fluorine and PFAS in the Products' packaging; or (2) the removal of such chemicals from the Products' packaging, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not

occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

**<u>COUNT III</u>**
**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

125.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

126.    Plaintiff McDowell brings this claim individually and on behalf of the California Subclass against Defendant.

127.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

128.    The Products at issue here are each a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

129.    Plaintiff McDowell and the Class Members who purchased the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

130.    Defendant is in the business of manufacturing, assembling, and/or producing the Products and/or selling the Products to retail buyers, and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

131.    Defendant impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Products were unsafe for consumption. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

132.    Plaintiff McDowell and California Subclass Members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Products.

133.    The Products were not altered by Plaintiff McDowell or the California Subclass Members.

134.    The Products were defective at the time of sale when they left the exclusive control of Defendant. The issue as described in this complaint was latent in the defect in the Products – that they are unfit for use and posed a significant safety risk -- is not discoverable at the time of sale.

135.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

136.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use and posed a significant safety risk.

137.    On March 30, 2022, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendant a notice letter apprising Defendant of its breach of warranties.

138.     Plaintiff McDowell and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

**COUNT IV**
**(Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq*.)**

139.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

140.     Plaintiff McDowell brings this claim individually and on behalf of the California Subclass against Defendant.

141.     Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Products as safe and sustainable when, in fact, the Products were not safe and not sustainable.

142.     By its actions, Defendant disseminated uniform advertising regarding the Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

143.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain substances that pose a significant risk to the health and wellbeing of Plaintiff McDowell and the Subclass Members as well as to the environment.

144.     Defendant continues to misrepresent to consumers that the Products were safe and sustainable.  However, as described, this is not the case.

145.     In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff

McDowell and other Class Members based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars. Plaintiff McDowell and Class Members were injured in fact and lost money and property as a result.

146. The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

147. As a result of Defendant's wrongful conduct, Plaintiff McDowell and Class Members lost money in an amount to be proven at trial. Plaintiff McDowell and Class Members are therefore entitled to restitution as appropriate for this cause of action.

148. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

149. Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

150. Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendant's representations as well of those of Defendant's competitors

who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

151.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the organic fluorine and PFAS in the Products' packaging; or (2) the removal of such chemicals from the Products' packaging, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

**COUNT V**
**(Violation Of The New York Deceptive Trade Practices Act, New York Gen. Bus. Law § 349, et seq.)**

152.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

153.    Plaintiff Collora brings this claim individually and on behalf of the New York Subclass against Defendant.

154.    By reason of the acts set forth above, Defendant has been and is engaged in deceptive acts or practices in the conduct of a business, trade, or commerce in violation of New York's General Business Law § 349.

155.    Defendant engaged in unfair and/or deceptive conduct, by *inter alia*, misrepresenting the Products as safe and sustainable when, in fact, the Products were not safe and not sustainable.

156.    The public is likely to be damaged because of Defendant's deceptive trade practices or acts.  Specifically, Defendant's false, deceptive, or misleading statements implicate the health and safety of those consumers deceived by Defendant.

157.     Defendant directs its conduct at consumers, as Defendant's misrepresentations are contained in marketing targeted toward consumers, including its product packaging and its advertisements.  As such, Defendant's conduct as alleged herein is consumer oriented.

158.     Defendant's deceptive acts are likely to mislead a reasonable consumer acting reasonably under the circumstances.

159.     Defendant's deceptive acts affect the public interest in the state of New York because, consumers located in New York have purchased the Products in reliance on Defendant's false, deceptive, or misleading statements.

160.     As a result of Defendant's wrongful conduct, Plaintiff Collora and Class Members lost money in an amount to be proven at trial.

### COUNT VI
### (Violation Of The New York Deceptive Trade Practice Act, New York Gen. Bus. Law § 350, *et seq.* )

161.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

162.     Plaintiff Collora brings this claim individually and on behalf of the New York Subclass against Defendant.

163.     Defendant has made material, false or misleading statements or representations of fact about the Products.  Specifically, Defendant has misrepresented the Products as safe and sustainable when, in fact, the Products were not safe and not sustainable.

164.     Defendant's acts constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in the state of New York in violation of New York's General Busines Law § 350.

165.     The public is likely to be damaged because of Defendant's deceptive trade practices or acts.  Specifically, Defendant's false or misleading statements implicate the health and safety of those consumers deceived by Defendant.

166.     As such, Defendant's conduct as alleged herein is consumer oriented.

167.     As a result of Defendant's wrongful conduct, Plaintiff Collora and Class Members lost money in an amount to be proven at trial.

## COUNT VII
### (Fraud)

168.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

169.     Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

170.     Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) be establishing the following elements with sufficient particularity:

a. **WHO**:  Defendant, McDonald's, made material misrepresentations and/or omissions of fact about the Products through its labeling, website representations, and marketing statements, which include the statements that the Products are safe and sustainable.  These representations constitute omitted material information regarding harmful chemicals in the Products' packaging which is essential and integral to delivering the Products to the consumer.

b. **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain substances—organic fluorine and PFAS—that are widely known to have significant health repercussions.  Thus,

Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products are safe and sustainable, when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products in this manner.

c. **WHEN**: Defendant made material misrepresentations and/or omissions during the putative class periods, including prior to and at the time Plaintiffs and Class Members purchased the Products, despite its knowledge that the Products' packaging contained harmful substances.

d. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Products' packaging, website, and through marketing materials.

e. **HOW**: Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of heightened levels of organic fluorine and PFAS.

f. **WHY**: Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

g. **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

171.    At the time Plaintiffs and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as safe and sustainable.

172.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of products that are indeed safe for consumption and otherwise sustainable.

173.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

174.    Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

175.    Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

176.    Plaintiffs and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Products.

177.    Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VIII
### (Constructive Fraud)

178.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

179.    Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

180.    At the time Plaintiffs and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

181.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of products that are indeed safe for consumption and otherwise sustainable.

182.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

183.    Defendant had an obligation not to omit material information about or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiffs and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiffs and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

184.    Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

185.    Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

186.    Plaintiffs and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

187.     Defendant breached its duty to Plaintiffs and Class Members to make full disclosures of the safety of their Products.

188.     Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT IX
### (Fraudulent Inducement)

189.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

190.     Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

191.     Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

192.     Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

193.     Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

194.     Plaintiffs and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

195.     Plaintiffs and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

196.    Plaintiffs and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Products, and what information was available regarding the Products.

197.    Defendant intended to induce—and did, indeed, induce—Plaintiffs and Class Members into purchasing the Products based upon its affirmative representations and omissions.

198.    Plaintiffs and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiffs and Class Members to sustain actual losses and damages in a sum to be determined at trial.

### COUNT X
**(Money Had and Received)**

199.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

200.    Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

201.    As a result of the Plaintiffs' and Class Members' purchase of the Products, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiffs and Class Members in an amount to be determined at trial.

202.    No part of any of the monies due and owing to Plaintiffs and Class Members has been repaid, although Plaintiffs and Class Members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

203.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, if, for instance damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium

price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

204. Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.

<u>**COUNT XI**</u>
**(Fraudulent Concealment or Omission)**

205. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

206. Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

207. At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

208. Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

209. Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

210. Rather than inform consumers of the truth regarding the Products, Defendant misrepresented and omitted the quality of the Products as discussed herein at the time of purchase.

211. Defendant made these material misrepresentations and omissions to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a reputable company and that its Products are safe for use and is otherwise sustainable. The false

representations and omissions were material to consumers because the representations played a significant role in the value of the Products purchased.

212.    Plaintiffs and Class Members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout.  Plaintiffs and Class Members had no way of knowing that Defendant's misrepresentations and omissions as to the Products, and had no way of knowing that Defendant's misrepresentations and omissions were misleading.

213.    Although Defendant had a duty to ensure the accuracy of the information regarding the Products, it did not fulfill these duties.

214.    Defendant misrepresented and omitted material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Products.  Such benefits came at the expense of Plaintiffs and Class Members.

215.    Plaintiffs and Class Members were unaware of these material misrepresentations and omissions, and they would not have acted as they did had they known the truth.  Plaintiffs' and class members' actions were justified given Defendant's misrepresentations and omissions. Defendant was in the exclusive control of material facts and/or had superior knowledge of material facts, and such facts were not known to the public.

216.    Due to Defendant's misrepresentations and omissions, Plaintiffs and Class Members sustained injury due to the purchase of the Products that did not live up to their advertised representations.  Plaintiffs and Class Members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations and omissions.

217.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs, and Class Members' rights and well-being, and

in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT XII**
**(Fraudulent Misrepresentation)**

218.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

219.    Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

220.    Defendant falsely represented to Plaintiffs and the Class that the Products were safe for use and otherwise sustainable.

221.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Products.

222.    Defendant knew or should have known that its representations about the Products were false in that the Products are not safe for consumption as discussed throughout. Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

223.    Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment. Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiffs' and the Class' reliance on Defendant's misrepresentations was justifiable.

224.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they

known of the safety risks associated with the Products and that they do not conform to the Products' labels, packaging, advertising, and statements.

225.    Plaintiffs and the Class seek actual damages, attorneys' fees, costs, and other such relief the Court deems proper.

<u>**COUNT XIII**</u>
**(Negligent Misrepresentation)**

226.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

227.    Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

228.    Defendant had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

229.    Defendant breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

230.    Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Products were not safe for use and not sustainable.

231.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they

known that the Products were not safe for consumption and that the Products do not conform to the Products' labeling, packaging, advertising, and statements.

232.    Plaintiffs and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## COUNT XIV
### (Quasi-Contract / Unjust Enrichment)

233.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

234.    Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

235.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

236.    Plaintiffs and Class Members conferred benefits on Defendant by purchasing the Products.

237.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were unfit for their intended purpose as they were unsafe for use.  These omissions caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts were known.

238.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

239.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, if, for instance damages resulting from their purchase of the Products is determined to be

an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

240. Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.

## COUNT XV
### (Breach of Express Warranty)

241. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

242. Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

243. Plaintiffs and Class Members formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Products.

244. The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.

245. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

246. As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Products are safe for consumption and are otherwise sustainable.

247. Plaintiffs and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

248. Defendant breached express warranties about the Products and their qualities because despite Defendant's warranties that the Products are safe for consumption and are otherwise sustainable, the Products are objectively not in fact safe for use and not sustainable. Thus, the Products did not conform to Defendant's affirmations and promises described above.

249. Plaintiffs and each Class Member would not have purchased the Products had they known the true nature of the Products.

250. On March 30, 2022, prior to the filing of this Complaint, Plaintiff Ken McDowell, by and through Plaintiffs' counsel sent Defendant a notice letter apprising Defendant of its breach of warranties. On May 10, 2022, Plaintiff Joseph Collora, by and through Plaintiff's counsel, sent a notice letter apprising Defendant of its breach of warranties. Defendant has failed to remedy the issues identified in Plaintiffs' notice letters.

251. As a result of Defendant's breach of warranty, Plaintiffs and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

<u>**COUNT XVI**</u>
**(Negligent Failure to Warn)**

252. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

253. Plaintiffs bring this claim individually and on behalf of the Class and Subclasses under the laws of their place of purchase.

254. At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products and their packaging. At all relevant times, it was reasonably foreseeable by Defendant

that the use of the Products in their intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class as the ultimate users of the Product.

255.     At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiffs and Class Members, as the defect in the Products -- that they are unfit for use and posed a significant safety risk -- existed at the time of their design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

256.     Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products, had a duty to warn Plaintiffs and the Class of all dangers associated with the intended use of the Products.

257.     At minimum, the duty arose for Defendant to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

258.     Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Products, including Plaintiffs and the Class, regarding the true nature of the Products, their risks, and potential dangers.

259.     Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Products contain ingredients known to cause adverse health effects in humans.

260.     Defendant knew, or through the exercise of reasonable care, should have known of the inherent defect and resulting dangers associated with using the Products as described herein, and knew that Plaintiffs and Class Members could not reasonably be aware of those risks. Defendant failed to exercise reasonable care in providing Plaintiffs and the Class with adequate warnings.

261.     As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Products, including their intended use, could cause and has caused injuries and other damages, Plaintiffs and the Class have suffered damages, as described herein. Plaintiffs also request medical monitoring as a means to safeguard their health and mitigate any damages for future medical treatment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)     For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiffs as representative of the Class and the California and New York Subclasses and Plaintiffs' attorneys as Class Counsel;

(b)     For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiffs, the Class, and the California and New York Subclasses on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper;

(h)     For medical monitoring as a means to safeguard Plaintiffs' and Class Members health and to mitigate any damages for future medical treatment; and

(i)     For an order awarding Plaintiffs and the Class and California and New York Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: July 1, 2022                    Respectfully submitted,

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**

By: ___*/s/* Carl V. Malmstrom_____
              Carl V. Malmstrom
Carl V. Malmstrom
111 W. Jackson St., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Fax: (212) 686-0114
Email: malmstrom@whafh.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*Pro Hac Vice* Forthcoming)
Sean L. Litteral (*Pro Hac Vice* Forthcoming)
Elvia M. Lopez (*Pro Hac Vice* Forthcoming)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
            slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice* Forthcoming)
Alec M. Leslie (*Pro Hac Vice* Forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com
            aleslie@bursor.com

**SHUB LAW FIRM LLC**
Jonathan Shub
Kevin Laukaitis
134 Kings Hwy E., 2nd Fl.

Haddonfield, NJ 08033
T: (856) 772-7200
F: (856) 210-9088
klaukaitis@shublawyers.com
jshub@shublawyers.com

**FREED KANNER LONDON & MILLEN LLC**
Brian M. Hogan
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
bhogan@fkmlaw.com

**FREED KANNER LONDON & MILLEN LLC**
Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fkmlaw.com

*Attorneys for Plaintiffs and the Putative Class*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Carl V. Malmstrom, declare as follows:

1.      I am an attorney at law licensed to practice in the State of Illinois and a member of the bar of this Court.  I am Of Counsel at Wolf Haldenstein Adler Freeman & Herz LLC, counsel of record for Plaintiff Ken McDowell.  Plaintiff McDowell resides in San Rafael, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of Illinois.  Additionally, Defendant maintains its principal place of business in this District and Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiffs from this District.

I declare under the penalty of perjury under the laws of the State of Illinois and the United States that the foregoing is true and correct and that this declaration was executed at Chicago, Illinois, this 30th day of June, 2022.


    */s/ Carl V. Malmstrom*
           Carl V. Malmstrom

52